Gregory YOUNG, Odetta Young, Edward Huyer, Connie Huyer, and Sue Ann Ross, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**WELLS FARGO & COMPANY**
**and Wells Fargo Bank,**
**N.A., Defendants.**

No. 4:08–cv–507 RP–CFB.

United States District Court,
S.D. Iowa,
Central Division.

Oct. 27, 2009.

Deborah Clark–Weintraub, Whatley
Drake & Kallas LLC, Michael R. Reese,

Kim E. Richman, Reese Richman LLP, New York, NY, Roxanne Barton Conlin, Roxanne Conlin & Associates, Des Moines, IA, Sara C. Hacker, Whatley Drake & Kallas LLC, Birmingham, AL, Mario A. Pacella, J. Preston Strom, Jr., Strom Law Firm LLC, Columbia, SC, for Plaintiffs.

Michael A. Giudicessi, Faegre & Benson LLP, Des Moines, IA, Mark D. Lonergan, Michael J. Steiner, John B. Sullivan, Joshua Eric Whitehair, Severson & Werson, San Francisco, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendants', Wells Fargo & Co. (hereinafter "WFC") and Wells Fargo Bank, N.A. (hereinafter "WFB") (collectively "Wells Fargo" or "Defendants"), Motion to Dismiss the Corrected First Amended Complaint and Strike Allegations or, in the alternative, Motion for a More Definite Statement (hereinafter "Motion to Dismiss"), filed on April 6, 2009. Clerk's No. 51. Plaintiffs, Gregory Young and Odetta Young (collectively "the Youngs"), Edward Huyer and Connie Huyer (collectively "the Huyers"), and Sue Ann Ross ("Ross"), (collectively "Plaintiffs") filed their Response to the Motion to Dismiss on May 6, 2009. Clerk's No. 63. Wells Fargo filed a Reply in Support of the Motion to Dismiss on May 27, 2009. Clerk's No. 64. The Court heard oral arguments on the Motion to Dismiss on August 17, 2009. Clerk's No. 81. The matter is fully submitted.

## I. FACTUAL AND LEGAL ALLEGATIONS

The allegations in this putative class action center around Wells Fargo's use of a computer system that, according to Plaintiffs, is programmed to automatically assess excessive mortgage servicing fees following late payments. First Am. Compl. (hereinafter "Compl.") ¶ 3. Each named Plaintiff has a home mortgage with Wells Fargo. *Id.* ¶¶ 44, 56, 66. The Huyers also have a second home mortgage, which they obtained from Star Funding, LLC. *Id.* ¶ 54. Each of these mortgages is serviced by WFB, through its mortgage servicing division, Wells Fargo Home Mortgage. *Id.* ¶¶ 44, 56, 66. Plaintiffs allege that Wells Fargo uses a specially programmed computer software platform, called the Fidelity Mortgage Servicing Package (hereinafter "Fidelity MSP"), to manage and administrate its mortgage servicing, and that the system has been used to systematically charge unwarranted, improper, and unreasonable property inspection fees and late fees. *Id.* ¶¶ 1–3, 27, 37. With respect to the property inspection fees, Plaintiffs allege that the Fidelity MSP system is programmed to automatically charge as many property inspection fees as possible, irrespective of whether they are reasonably necessary. *Id.* ¶¶ 3, 51, 63. They highlight that Wells Fargo's computer system ordered property inspections while mortgagors continued to make payments on their home mortgages, that each property inspection is only a drive-by inspection, and that no one reviews the results of the property inspections. *Id.* ¶¶ 34–35, 47–51, 59–63. Plaintiffs argue that this practice of indiscriminately ordering, and charging borrowers for, property inspections is unreasonable and violates the terms of the mortgage agreements. *Id.* ¶¶ 20–21, 40.

Regarding the late fees, Plaintiffs contend that the Fidelity MSP system was programmed to "stack" late fees by misapplying incoming payments after a missed

payment. *Id.* ¶¶ 3, 52–53, 64–65; Tr.[1] at 37, 48. Plaintiffs assert that payments they made after missing a payment have been applied to outstanding fees and costs before satisfying principal and interest. Compl. ¶¶ 3. According to Plaintiffs, this practice violates the terms of the borrowers' mortgage agreements and results in additional and wrongfully charged late fees. *Id.* ¶¶ 3, 20, 21.

Plaintiffs allege that Wells Fargo knew, or recklessly disregarded, that the property inspection fees and late fees were unreasonable and unlawful, and that the Fidelity MSP system was intentionally designed and operated to defraud mortgagors, who had their mortgages serviced by Wells Fargo. *Id.* ¶¶ 37–38, 83. In addition, Plaintiffs assert that Wells Fargo repeatedly sent Plaintiffs materially false and misleading agreements, contracts, and monthly mortgage statements by mail and wire, and that the scheme was designed to conceal its existence, i.e., by listing the property inspection fees as "other charges" on mortgage statements. *Id.* ¶¶ 40–41.

Plaintiffs bring this action on behalf of themselves, as well as a nationwide class defined as "all persons who were charged computer-generated fees by Wells Fargo as a result of a late payment of their mortgage." *Id.* ¶ 90. Plaintiffs claim Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.

(Counts I–II); various states consumer protection laws (Counts III–VI); and that Wells Fargo's actions constitute common law fraud, deceit and/or misrepresentation, and unjust enrichment (Counts VII–VIII). *Id.* ¶ 10. Wells Fargo sets forth numerous argument in its Motion to Dismiss, asserting individual failings in the RICO and state law claims, as well as a failure to set forth each claim with sufficient particularity. In addition, Wells Fargo requests the Court strike a portion of the Complaint. In the alternative to its arguments for dismissal, Wells Fargo asserts that each of the claims are vague and ambiguous, and it asks the Court to order a more definite statement of each. The Court will address each request.

## II. DISMISSAL OF ROSS UNDER THE FIRST–FILED RULE

█ As an initial matter, the Court addresses Wells Fargo's request that Ross be dismissed as a named Plaintiff under the first-filed rule. Wells Fargo points out that Ross has another action pending in the Eastern District of California that presents the same claims as the present action. E.D. Cal. Case No. 2:09–cv–319; *see also* Clerk's No. 52, Ex. I (hereinafter "California Action").[2] Wells Fargo argues that Ross should be dismissed as a named Plaintiff because Ross's California Action was filed on December 8, 2008, several months before she joined this putative class action as a named Plaintiff on March

---

1. All references to the oral argument transcript are to the Court's daily unedited Real-Time transcript provided by the Court Reporter.

2. Wells Fargo provided the Court with Ross's Complaint in the California Action, as well as several mortgage documents, filed as attachments to its Motion to Dismiss. *See* Clerk's No. 52, Exs. A–I. Since Ross's California Action Complaint is a public record and Plaintiffs' Complaint references the mortgage doc-

uments, the Court receives and considers them as a part of the record in considering the Motion to Dismiss. *See Noble Sys. Corp. v. Alorica Cent., LLC,* 543 F.3d 978, 982 (8th Cir.2008) ("[A district court] may ... consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.' ") (quoting *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999)).

6, 2009. Plaintiffs counter that the "first-filed" rule does not apply here because Ross's California Action seeks different relief based on different events, and because the present action was filed on August 5, 2008, several months before Ross filed her California Action.

 When an action is pending in two different courts, "[t]o conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Nw. Airlines, Inc. v. Am. Airlines, Inc.,* 989 F.2d 1002, 1006 (8th Cir.1993); *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.,* 920 F.2d 487, 488 (8th Cir.1990) ("The well-established rule is that in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case.'") (quoting *Orthmann v. Apple River Campground Inc.,* 765 F.2d 119, 121 (8th Cir.1985)). "This first-filed rule 'is not intended to be rigid, mechanical, or inflexible,' but is to be applied in a manner best serving the interests of justice. The prevailing standard is that 'in the absence of compelling circumstances,' the first-filed rule should apply." *Nw. Airlines, Inc.,* 989 F.2d at 1005. It is within a district court's discretion to apply the first-filed rule. *Anheuser–Busch, Inc. v. Supreme Int'l Corp.,* 167 F.3d 417, 419 (8th Cir. 1999).

Ross's California Action brings suit against Wells Fargo, as well as several other mortgage servicers, for wrongful and unlawful acts in the negotiation and servicing of her home mortgage loans and associated foreclosure proceedings. In her California Action, Ross presents claims under both California statutory law and RICO based on, *inter alia,* the alleged fact that "defendants added costs and charges

to the payoff amount of the note that were not justified or proper under the terms of the note or law." California Action, Compl. at 8. Both the factual allegation and the remedy requested obviously overlap with the allegations and requested remedy in the present class action. Therefore, this Court's jurisdiction over Ross's claim in the present action and the California Court's jurisdiction over her California Action are "parallel."

 Further, though this putative class action was filed by the Youngs and the Huyers on August 5, 2008, Ross was not added as a named Plaintiff until the Amended Complaint was filed on March 6, 2009. *Compare* Clerk's No. 40 (transferring the case to Iowa from the District of California before Ross was added as a named Plaintiff) *with* Clerk's No. 41 (amending the Complaint to include Ross as a named Plaintiff). Only after a class has been certified and the unnamed class members are given notice, an opportunity to be heard, and a chance to opt out, can a court maintain jurisdiction over absent class members. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812–13, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). It follows that before a putative class action is certified, the Court does not have jurisdiction over the claims of unnamed plaintiffs. Since the putative class has not yet been certified and because Ross did not join this class action as a named Plaintiff until after she filed her California Action on December 8, 2008, the Court concludes that the California court had jurisdiction over Ross's RICO and state law claims against Wells Fargo first.

Thus, it appears Ross's claims before this Court are concurrent and parallel to her claims in the California Action. Ross has failed to present any argument that compelling circumstances exist for not applying the first-filed rule. Accordingly,

Ross will be dismissed as a named Plaintiff from the present action without prejudice.[3]

### III. MOTION TO STRIKE

■ Wells Fargo moves, pursuant to Federal Rule of Civil Procedure 12(f), to strike the portion of paragraph four of the Complaint in which Plaintiffs "incorporate by reference the findings of fact and opinion in *Stewart*." Courts may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). A district court enjoys liberal discretion to strike pleadings under Rule 12(f), however, striking a party's pleading is an extreme and disfavored measure. *Stanbury Law Firm, P.A. v. IRS*, 221 F.3d 1059, 1063 (8th Cir.2000).

Wells Fargo argues that the incorporation of the *Stewart* opinion leaves it uncertain of the scope of Plaintiff's complaint since the *Stewart* court dealt with a wide variety of bankruptcy matters that appear unrelated to the subject of this action. The Court agrees that there are portions of the 37 page *Stewart* opinion that are immaterial to the present action and that Wells Fargo should not be required to respond to facts and legal conclusions in the *Stewart* opinion that Plaintiffs did not highlight in the Complaint. The Court, however, notes that Plaintiffs' more specific references to the *Stewart* court's findings and opinion are relevant to the plausibility of Plaintiffs' allegation that Wells Fargo has engaged in a scheme to defraud home mortgage borrowers. Accordingly, the broad statement in paragraph four of the Complaint that generally incorporates the findings of fact and opinion in *Stewart* will be stricken, but the more specific references to the *Stewart* case in paragraphs four through six will remain.

### IV. CLAIMS REQUIRING MORE DEFINITE STATEMENTS

■ Federal Rule of Civil Procedure 12(e) allows a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Such motion "must point out the defects complained of and the details desired." *Id.* "A motion under Rule 12(e) is designed to strike at unintelligibility in a pleading rather than want of detail." *Patterson v. ABS Consulting, Inc.*, No. 4:08CV697RWS, 2009 WL 248683, at *2 (E.D.Mo. Feb. 2, 2009) (internal quotation marks and citation omitted).

In alternative to its Motion to Dismiss, Wells Fargo requests that the Court order Plaintiffs to supply a more definite statement on each of their claims.[4] In particular, Wells Fargo highlights Count VI, which asserts Wells Fargo's "actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protec-

---

**3.** If the circumstances surrounding Ross's California Action change such that it is no longer concurrent or no longer parallel to the present action, she may make application, noting the changed circumstances, to rejoin the present action as a named Plaintiff.

**4.** Though Wells Fargo asks for this remedy in alternative to its primary argument that all of Plaintiffs' claims should be dismissed for failing to satisfy the pleadings requirements set forth in Federal Rules of Civil Procedure 8(a) and 9(b), the Court finds the Motion for a More Definite Statement a more appropriate mechanism to address the failings of Counts VI–VIII. As noted below, Plaintiffs have pleaded a multitude of potential material facts, but Plaintiffs' vague legal allegations fail to set forth how the facts pleaded present a violation of law, precluding a meaningful analysis of whether Rules 8(a) and 9(b) are satisfied.

tion statutes...." Compl. ¶ 139. The Complaint then proceeds to list consumer protection statutes from thirty-nine different states.

■ The "claims" presented in this laundry-list format are strikingly conclusory. Each is a single line which asserts that Wells Fargo engaged in "unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices," and lists the general section of the relevant state statutory code containing consumer protection provisions. The lack of specificity in these thirty-nine different causes of action is in stark contrast to the Plaintiffs' RICO, California, and South Dakota claims in Counts I, III, IV, and V. In laying forth their RICO claim, Plaintiffs connect the extensive fact pleadings set forth in paragraphs 20–66 with the required elements of a RICO claim. Compl. ¶¶ 67–89 (identifying the RICO enterprise, predicate acts, and pattern of racketeering activity). Plaintiffs' claims under the California and South Dakota consumer protection statutes, while not as thorough, still specify how those statutes protect against the activities set forth in Plaintiffs' allegations, and highlight which provisions of the statutes are specifically applicable to Plaintiffs' allegations. Count VI, on the other hand, wholly lacks an application of the factual allegations to the numerous causes of action listed. Such "shotgun pleading" obscures Plaintiffs' material allegations, severely hindering Wells Fargo's ability to form a reasonable response. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (finding that "[s]hotgun pleading" results in counts that are "replete with factual allegations that could not possibly be material to that specific count, and that any allegations that are material are buried beneath innumerable pages of rambling irrelevancies"); *see also Johnson Enters. of Jacksonville, Inc. v. FPL*

*Group, Inc.,* 162 F.3d 1290, 1332 (11th Cir.1998) ("These general allegations operated as camouflage, obscuring the material allegations of [plaintiff's] claims and necessarily implying that all the allegations were material to each claim."). "Shotgun pleading" is especially problematic with respect to pleading numerous causes of action under a variety of state consumer protection statutes because the type and degree of protection offered by the various state laws varies extensively. *See* Michael Isaac Miller, *The Class Action (Un)fairness Act of 2005: Could It Spell the End of the Multi-state Consumer Class Action?* 36 Pepperdine L. Rev. 879, 890–95 (2009); Donald M. Zupanec, *Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts,* 89 A.L.R.3d 449 (2009). The Court, therefore, grants Wells Fargo's Motion for a More Definite Statement with regard to Count VI.

■ The Court is also concerned that Plaintiffs' common law claims of deceit, fraud, or misrepresentation (Count VII) and unjust enrichment (Count VIII) lack sufficient specificity for Wells Fargo to respond. In Count VII, Plaintiffs lay out the particulars of what they allege were misrepresentations in the monthly mortgage statements, and assert that the misrepresentations were material, were made intentionally, and were relied upon by Plaintiffs to their detriment, satisfying the general elements of common law fraud. Compl. ¶¶ 81, 142–47. Likewise, in Count VIII, Plaintiffs have asserted the essential elements of a generic unjust enrichment claim, i.e., that Wells Fargo was unjustly enriched by the alleged scheme to defraud to the detriment of Plaintiffs, and that the fundamental principles of justice, equity and good conscience require restitution. *Id.* ¶¶ 149–52. However, in both Count VII and Count VIII, Plaintiffs have failed to specify the states' laws under which

they intend to bring these common law claims. Such specificity is necessary so that Wells Fargo and the Court can identify the appropriate legal standard. *See, e.g., In re Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214, 223–24 (E.D.La. 1998) (describing various state law variations in a fraudulent concealment claim, including the burden of proof, the duty to disclose, materiality, reliance, and the measure of damages); *In re Telectronics Pacing Sys., Inc., Accufix Atrial J Leads Prod. Liab. Litig.,* 164 F.R.D. 222, 230 (S.D.Ohio 1995) ("[S]tates vary on whether they require proof of intent as an element in a fraud action. . . ."); 26 Williston on Contracts § 69:3 (4th ed.) (noting the differences in scienter requirements for actual and constructive fraud cases); *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 167–68 (E.D.Pa.2009) (rejecting argument that unjust enrichment claims are substantially identical across all fifty states and dismissing unjust enrichment claims that were not linked to the law of any particular state); *but see In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 58 (D.N.J.2009) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict."). Without reference to the law of any particular state, the common law claims in Count VII and VIII are so vague that Wells Fargo cannot reasonably prepare a response. Accordingly, the Court also grants Wells Fargo's Motion for a More Definite Statement with regard to Counts VII and VIII. Plaintiffs will have twenty days to amend the Complaint to provide more definite statements of Counts VI–VIII.

## V. MOTION TO DISMISS

Wells Fargo presents several arguments in its Motion to Dismiss that specifically challenge the viability of individual Counts of Plaintiffs' Complaint, as well as a broader argument that Plaintiffs have not sufficiently pleaded any of the Counts to the satisfaction of Rules 8(a) and 9(b). The Court first addresses Wells Fargo's more narrow challenges to the individual Counts, then proceeds to consider whether surviving Counts satisfy Rules 8(a) and 9(b).

### A. Standard of Review

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where a plaintiff's complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "In reviewing the complaint, the Court must 'accept as true all of the factual allegations contained in the complaint.'" *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 549 (8th Cir.2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "All reasonable inferences from the complaint must be drawn in favor of the plaintiff." *Id.*

A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. The Supreme Court, in *Ashcroft v. Iqbal,*

described a "two-pronged approach" for evaluating complaints challenged under Rule 12(b)(6). *Iqbal,* 129 S.Ct. at 1949–50. First, a court should divide the allegations between factual and legal allegations; factual allegations should be accepted as true, but legal allegations should be disregarded. *Id.* Second, the factual allegations must be parsed for facial plausibility. *Id.* at 1950.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). The Supreme Court instructed that a reviewing court must "draw on its judicial experience and common sense" when determining whether a complaint states a plausible claim for relief. *Id.* In doing so, the reviewing court may consider other, more likely explanations for the acts described in the complaint when determining whether the pleaded factual allegations give rise to a plausible entitlement to relief. *Id.* at 1950–51.

### B. *State Law Claims*

Plaintiffs' state law claims allege that Wells Fargo perpetrated a scheme to defraud by imposing repeated drive-by property inspections and improper late fees that were unlawful, deceptive and unfair. Plaintiffs assert Wells Fargo's actions, omissions, representations and conduct violated California Business and Professional Code § 17200 (hereinafter "UCL"), the California Consumers Legal Remedies Act, California Civil Code § 1750 et seq. (hereinafter "CLRA"), and the South Dakota Deceptive Trade Practices and Consumer Protection Act, South Dakota Codified Laws §§ 37–24–6 and 37–24–31 (hereinafter "SDCL").

#### 1. *Preemption of state law claims.*

Wells Fargo argues that the National Banking Act ("NBA"), 12 U.S.C. §§ 24 and 86, and Office of the Comptroller of the Currency ("OCC") regulations, 12 C.F.R. §§ 7.4001 and 34.4, completely preempt Plaintiffs' state law claims. Plaintiffs respond that their state law claims are not preempted by federal law because the claims do not conflict with the NBA or with OCC regulations and, indeed, are explicitly permitted under OCC regulations.

The Supremacy Clause of the United States Constitution states that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Courts have recognized three generalized scenarios where federal law preempts state law: 1) express preemption, where "Congress define[s] explicitly the extent to which its enactments preempt state law"; 2) field preemption, where Congress's regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or where an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and 3) conflict preemption, where state and federal law directly conflict, making it "impossible for a private party to comply with both state and federal requirements" or where state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (citations omitted); *see also CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) ("Where a state statute conflicts with, or frustrates, federal law, the former must give way."); *Nordgren v. Burlington N. R.R. Co.,* 101 F.3d 1246, 1248 (8th Cir.1996). " 'The purpose of Congress is the ultimate touchstone' in every preemption case." *Medtronic Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Federal regulations preempt state law with the same force and effect as the Federal statutes under which they are promulgated. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

■■■■■ "National banks' business activities are controlled by the [NBA] and regulations promulgated thereunder by [OCC]," and "[f]ederal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank, N.A.,* 550 U.S. 1, 7, 11, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007). The Supreme Court and the Eighth Circuit have made clear on numerous occasions that the NBA and OCC regulations do not preempt the field of national bank regulation. *See, e.g., First Nat'l Bank in St. Louis v. Missouri,* 263 U.S. 640, 656, 44 S.Ct. 213, 68 L.Ed. 486 (1924); *North Dakota v. Merchants Nat'l Bank & Trust Co.,* 634 F.2d 368, 374–78 (8th Cir.1980). Instead, when Congress enacted the NBA, it created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, L.L.C.,* —— U.S. ——, 129 S.Ct. 2710, 2718, 174 L.Ed.2d 464 (2009).

"National banks are subject to the laws of a state in respect of their affairs, unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies, or conflict with the paramount law of the United States." *First Nat'l Bank in St. Louis,* 263 U.S. at 656, 44 S.Ct. 213. Therefore, "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Watters,* 550 U.S. at 12, 127 S.Ct. 1559. "[I]f a state statute of general applicability is not substantively pre-empted, then 'the power of enforcement must rest with the [State] and not with' the National Government." *Cuomo,* 129 S.Ct. at 2717 (citing *First Nat'l Bank in St. Louis,* 263 U.S. at 660, 44 S.Ct. 213); *Merchants Nat'l Bank & Trust Co.,* 634 F.2d at 374–78 (holding that Congress did not intend to preempt state laws of general application, such as common law tort and unfair competition statutes, by occupying the field of banking law when it enacted the NBA); *see also Gen. Motors Corp. v. Abrams,* 897 F.2d 34, 41–43 (2d Cir.1990) ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area."); *Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (noting that regulations designed to prevent deception of consumers are within the state's historic police powers).

The NBA authorizes OCC to prescribe rules and regulations to carry out the responsibilities of the office, 12 U.S.C. § 93a, and with specific respect to national bank real estate lending powers, the OCC is authorized to make orders, rules and regulations regarding real estate loans. 12 U.S.C. § 371. Pursuant to its statutory authority, OCC has promulgated several

regulations that describe the scope of federal preemption of banking law. The OCC regulation at 12 C.F.R. § 34.4 sets forth the extent of preemption regarding real estate lending. Subsection (a) specifically identifies fourteen areas in which "a national bank may make real estate loans under 12 U.S.C. § 371 without regard to state law limitations," including certain terms of lending, disclosures and advertising, servicing mortgages, and rates of interest on loans. The more general rule regarding preemption, however, is set forth in § 34.4(b): "State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers: (1) Contracts; (2) Torts; . . . ."[5] This standard was explicitly intended to be "consistent with the various formulations" of "the conflicts standard" "articulated by the Supreme Court." *Bank Activities & Operations; Real Estate Lending and Appraisals,* 69 Fed. Reg. 1904–1, 1910 (Jan. 13, 2004) (citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) and *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 33–34, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)).

Wells Fargo's argument centers on the explicit statutory preemption of state law claims for excessive rates of interest set forth in § 86 of the NBA. Wells Fargo notes that late fees are encompassed within the definition of "interest" in OCC regulations. 12 C.F.R. § 34.4(a)(12); *see also Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 737, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (finding reasonable the OCC's interpretation of "interest" as including late fees). Thus, it reasons, Plaintiffs cannot state a claim for excessive late fees under state law. Wells Fargo is correct insofar as is asserts that § 86 preempts state law, however, the Court disagrees with Wells Fargo's characterization of the scope of that preemption.

■ Section 85 of the NBA sets forth the substantive limits on the rates of interest that national banks may charge. Section 86 provides the remedy for claims that a national bank imposed a greater rate of interest than is allowed by § 85. The OCC regulation at 12 C.F.R. § 34.4(a)(12) mirrors §§ 85 and 86 in its focus on possible state law limitations specifically directed at rates of interest. *See* 12 C.F.R. § 34.4(a)(12) n. 1 (noting that "limitations on charges that comprise rates of interest on loans by national banks are determined under Federal law" and citing 12 U.S.C. § 85). The following passage from the Supreme Court's opinion in *Beneficial National Bank v. Anderson* describes the narrow scope of the preemption created by §§ 85 and 86:

> In actions against national banks for usury,[6] [§§ 85 and 86] supersede both the substantive and the remedial provi-

---

**5.** Similarly, 12 C.F.R. § 7.4009, the OCC regulation that governs

with respect to any national bank power or aspect of a national bank's operations that is not covered by another OCC regulation specifically addressing the applicability of state law, provides that state laws that "obstruct, impair, or condition" a bank's ability to conduct activities authorized under state law do not apply to national banks, and this provision. §§ 7.4009(b), (c)(1). The OCC

has also promulgated regulations that mirror 12 C.F.R. §§ 7.4009 and 34.4, and that specifically address the extent of preemption in the narrow fields of deposit-taking and lending. *See id.* §§ 7.4007, 7.4008.

**6.** Black's Law Dictionary defines usury as "1. Historically, the lending of money with interest. 2. Today, the charging of an illegal rate of interest. 3. An illegally high rate of interest." Black's Law Dictionary (8th ed. 2004).

sions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant, as here, relies entirely on state law. Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank.

539 U.S. 1, 11, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003). Thus, it is plain that a plaintiff cannot bring a state law claim against a national bank for charging excessive rates of interest. However, nothing in the statute, OCC regulations, or Supreme Court precedent indicate that § 86 preempts state law suits asserting claims beyond the scope of a traditional usury claim.

■ Here, it is clear that when Plaintiffs make reference to "excessive" fees in the Complaint, they are not alleging that the rate of interest charged by Wells Fargo exceeded the interest rate established by statutory law. If that were Plaintiffs' claim, then it would be a usury claim subject to preemption. In the instant case, however, Plaintiffs' allegation relate to Wells Fargo's alleged practice of assessing additional "excessive late fees in the months following the missed payment." Compl. ¶¶ 52, 64. Hence, the basis of the alleged excessiveness is that Wells Fargo charged fees when they should not, a wholly different claim from a claim that Wells Fargo applied an illegal interest rate. As such, Plaintiffs' claims are not usury claims and are not subject to complete preemption by § 86 of the NBA. This conclusion is in line with the conclusions of other courts when presented with similar arguments. For instance, in *Cross–County Bank v. Klussman,* the Northern District of California rejected defendant's argument that § 86 preempted the plaintiff's claims of excessive fees, even though late fees are included within the statutory defi-

nition of "interest." No. C–01–4190–SC, 2004 WL 966289, at *6 (N.D.Cal. Apr. 30, 2004). The *Klussman* court observed that since the plaintiff "claim[ed] that various interest fees were not disclosed, were unwarranted, were based on charges that were themselves improper, and in short, should never have been charged at all," plaintiff's action did not present a claim for usury. *Id.; see also Poskin v. TD Banknorth, N.A.,* —— F.Supp.2d ——, ——, 2009 WL 2981963, at *20 (W.D.Pa.2009) (rejecting argument that claims of unfair trade practices should be preempted as usury claims); *Hunter v. Beneficial Nat'l Bank USA,* 947 F.Supp. 446, 451–52 (M.D.Ala.1996) (holding that a claim that the defendant fraudulently failed to disclose certain charges for interest was not a claim for usury).

■ The Court also notes that there is no basis to conclude at this stage of litigation that Plaintiffs' state law claims would interfere with the purposes of national banks, would tend to impair or destroy the efficiency of national banks as federal agencies, or would conflict with any other provision of federal law. Wells Fargo has offered no argument for such a conclusion except when it stated at the hearing: "There's nothing in the Complaint that I believe would allow a Court to conclude ... there's only an incidental impact on the real estate lending powers of Wells Fargo." Tr. at 25. This argument fails, however, because there is no presumption that the NBA preempts state law. As § 34.4 indicates, the presumption is that a claim brought under state tort law, and by extension, under general state consumer protection statutes, will not be preempted unless the Court has reason to conclude the claim will have more than an incidental effect on the exercise of the national bank's real estate lending powers. The "central inquiry" in considering conflict preemption is whether the legal duty that

is the predicate of the common-law damages action directly conflicts with the governing federal law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 524, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Here, Plaintiffs' claims are premised on the theory that Wells Fargo had a legal duty not to employ procedures designed to defraud borrowers by charging unreasonable fees. Numerous courts considering similar suits have concluded that claims brought under state "laws of general application, which merely require all businesses (including banks) to refrain from fraud [and] misrepresentations do not impair a bank's ability to exercise its lending powers and only 'incidentally affect' the exercise of a national bank's powers." *Jefferson v. Chase Home Finance,* No. C 06–6510, 2008 WL 1883484, at *12–14 (N.D.Cal. Apr. 29, 2008) (holding that the use of the general state consumer protection laws to bring advertising-based claims against a national bank was not preempted by the NBA or OCC regulations); *see also Poskin v. TD Banknorth, N.A.,* —— F.Supp.2d ——, ——, 2009 WL 2981963, at *21 (W.D.Pa.2009) (adopting the reasoning of *Jeferson* and holding that a general consumer protection statute was not preempted); *Baldanzi v. WFC Holdings Corp.,* No. 07 Civ. 9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."); *but see Martinez v. Wells Fargo Bank, N.A. et al.,* No. C–06–03327, 2007 WL 963965, at *8 (N.D.Cal. Mar. 30, 2007) (holding that OCC regulations giving national banks discretion to set fees conflicted with and, therefore, preempted plaintiffs' state law claims against defendant national banks for charging certain real estate transaction fees).

 In this case, Wells Fargo has failed to specify any provision of the NBA or OCC regulations that conflicts, or even overlaps, with the protections against unfair or deceptive practices enumerated in Plaintiffs' Complaint. Nor has the Court's examination of the NBA and OCC regulations located any OCC regulation that targets the type of fee assessment procedures that Plaintiffs identify in their Complaint as unlawful, improper, and unreasonable. *Cf. Davis v. Chase Bank U.S.A., N.A.,* 650 F.Supp.2d 1073, 1085–86 (C.D.Cal.2009) (holding that the express language of OCC regulations did not expressly preempt plaintiff's state consumer protection claims, but to the limited extent that the plaintiff challenged the allocation of credit card payments or the charging of a finance fee generally as an unfair act, the claims were preempted); *Montgomery v. Bank of Am. Corp.,* 515 F.Supp.2d 1106, 1113 (C.D.Cal.2007) (concluding that plaintiff's claims were preempted as conflicting with specific OCC regulations where plaintiff challenged the amount and means of disclosing overdraft fees under California consumer protection statutes). Because the NBA and OCC regulations do not expressly preempt the Plaintiffs' state law claims, do not completely occupy the same field, and do not conflict with Plaintiffs' state law claims, the Court concludes that Plaintiffs' state claims are not preempted.

### 2. *Choice of law provision: California and South Dakota claims.*

Wells Fargo asks the Court to dismiss Counts III–V, arguing that the choice of law clause in each of the mortgages precludes a suit by either the Youngs or the Huyers under both California and South Dakota law. Plaintiffs counter with two arguments: (1) WFC is not a party to the mortgage agreement and, thus, cannot invoke the contractual clause; and (2) the

tort-based claims asserted by Plaintiffs are outside the contract and, therefore, the choice of law provision does not apply to Plaintiffs' claims. After examining the choice of law language at issue, the Court concludes it is premature to reach either of these substantive arguments.

Each of the mortgages provides: "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." Clerk's No. 52, Exs. C, E, H (¶ 16 in each). Plaintiffs have alleged that Wells Fargo services mortgages in all fifty states, including California and South Dakota. They bring this action not only in their own names, but also on behalf of all persons similarly situated. Thus, if the putative nationwide class is certified, even assuming that the choice of law provision governs the present dispute, some members of the class will be able to maintain a cause of action under California and South Dakota law.

Courts have split on the question of whether named plaintiffs in a putative class action can assert state law claims on behalf of absent class members residing in other states before certification, even if the named plaintiffs could not assert a claim under the particular state's law themselves. *Compare Doyel v. McDonald's Corp.*, No. 4:08–CV–1198, 2009 WL 350627, at *5 (E.D.Mo. Feb. 10, 2009) (denying a defendant's motion to dismiss claims made solely on behalf of purported class members because the argument goes to the plaintiffs' ability to certify a class pursuant to Rule 23 and act as a class representatives) and *Ramirez v. STI Prepaid LLC*, 644 F.Supp.2d 496, 505 (D.N.J.2009) ("The ability of the named Plaintiffs to adequately represent class plaintiffs in different states and the extent to which common issues of law and fact predominate across the putative class members are factors

that will be considered in the class certification phase.") *with In re G–Fees Antitrust Litig.*, 584 F.Supp.2d 26, 35–36 (D.D.C.2008) (dismissing claims because the "allegations do not support an inference that any of the named plaintiffs have been personally injured such as to provide them with the causes of action [under various state consumer protection laws]"). Though some courts have rejected such class claims on the basis of standing, the Court concurs with the view that "the question whether [representative parties] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1785.1 (3d ed. 2005); William B. Rubenstein et al., 1 *Newberg on Class Actions* § 2.7 (4th ed. 2008) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions. The fact that the plaintiff now seeks to represent the rights of absent parties because the case or controversy is common to those parties does not in any way create additional constitutional standing requirements.") (footnote omitted). The Court believes the same principle applies when the remedies available to a named plaintiff in a putative class action are limited by a choice of law provision as when limited by jurisdictional requirements. Since this is a motion to dismiss, and the Court has not had occasion to consider whether the Rule 23 class certification requirements are satisfied by the putative class, it would be premature to dismiss the California and South Dakota statutory claims simply because neither

the Huyers nor the Youngs own mortgaged property in those jurisdictions. Thus, the Court need not decide now whether the named Plaintiffs can present their own claims under California or South Dakota law. It is sufficient that the choice of law provision provides a basis to conclude that class members encompassed within the nationwide class will have claims under the statutes set forth in Counts III–V.

### 3. UCL and the impact of Walker.

Plaintiffs allege Wells Fargo's fraudulent scheme, as set forth above, violates the UCL, California's unfair competition law. Wells Fargo seeks dismissal of Plaintiffs' UCL claim on the ground that it is barred by a previously decided California Court of Appeals case, *Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158, 121 Cal.Rptr.2d 79 (2002).

 The UCL prohibits acts or practices that are either unlawful or unfair or deceptive. *Morgan v. AT & T Wireless Serv., Inc.*, 177 Cal.App.4th 1235, 1253–55, 99 Cal.Rptr.3d 768 (2009).[7] In *Walker*, the California Court of Appeals considered whether the practice of charging mortgagors, who defaulted on their mortgage payments, property inspection fees was unlawful, unfair, or deceptive under the California UCL. *Walker*, 121 Cal.Rptr.2d at 86. The Walkers specifically alleged that Countrywide's regular and routine practice of imposing a property inspection fee on borrowers upon default was actually a "'disguised' late fee." *Id.* at 85. Upon Countrywide's motion for summary judgment, the *Walker* court considered such

facts as the amount that Countrywide charged for the loans, when the Walkers defaulted on their mortgage loan, when the property inspections began, general statistics about home vacancies following foreclosure and property inspections, as well as the contract language of the Walkers' mortgage. *Id.* at 89, 91, 93–94. Based on these factors, the *Walker* court concluded that the practice of charging property inspection fees to delinquent borrowers such as the Walkers furthered the legitimate business purpose of protecting the lender's security and, accordingly, the imposition of the property inspection fees was reasonable. *Id.* at 89.

Here, unlike in *Walker*, Plaintiffs do not challenge the imposition of property inspection fees in general, but rather, Plaintiffs assert that the manner in which Wells Fargo charged the property inspection fees is unreasonable. Plaintiffs allege that the frequency of the inspections, the cursory nature of the inspections, as well as the fact that the Huyers were charged for multiple property inspections in the same day, make the property inspection fees unreasonable. Further, Plaintiffs allege that the imposition of the property inspection fees, in combination with the imposition of other unlawful fees, was part of a larger scheme to increase the borrowers' indebtedness. These claims differ substantially from the claims presented in *Walker* and the question of whether the fees were reasonable in this context is a factual issue that cannot be addressed until the Court is presented with an evidentiary record. The Court concludes on the

---

7. A business practice is "unlawful" if it is "forbidden by law," and a business practice is "deceptive" if a plaintiff can show that members of the public are likely to be deceived. *Morgan,* 177 Cal.App.4th at 1253–55, 99 Cal. Rptr.3d 768. Though several standards have been applied, there is not a clear test to

determine what constitutes an "unfair" business practice in California. *Id.* The Court's analysis need not identify a particular standard for "unfair" business practices because Wells Fargo's challenge does not turn on the definition of "unfair" for the purposes of a UCL violation.

record before it that Plaintiffs' UCL claim are not barred by *Walker* and will not be dismissed on this ground.

### 4. *CLRA and* Fairbanks.

■ Plaintiffs assert that the alleged scheme also constitutes a violation of the CLRA. To state a claim under CLRA § 1770, the alleged "unfair methods of competition and unfair or deceptive acts or practices" must result in, or be intended to result in, the sale or lease of goods or services to a consumer.[8] "Goods" are defined as

> tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods which, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not severable therefrom.

§ 1761(a). "Services" are "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." § 1761(b). Plaintiffs have pleaded that Defendants' mortgage servicing is a "good" and/or "service."

Wells Fargo seeks to have Count IV dismissed because (1) it asserts that the CLRA does not apply to home mortgage loans; and (2) the facts alleged by Plaintiffs could not be construed as an unlawful act under the California CLRA. The Court agrees with Wells Fargo's contention that the CLRA does not apply to home mortgage loans, and need not consider whether the facts as alleged by Plaintiffs can be construed as unlawful acts under the CLRA.

The California Supreme Court recently held in *Fairbanks v. Superior Court,* that life insurance is neither a "good" nor a "service" covered by the CLRA. It held that life insurance, as a contract of indemnity, was not a "tangible chattel," and therefore, is not a "good" within the meaning of the CLRA. 46 Cal.4th 56, 92 Cal. Rptr.3d 279, 205 P.3d 201, 203 (2009). Neither could life insurance be construed as a "service" under the act because the contractual obligation to pay money was not "work or labor, nor [wa]s it related to the sale or repair of any tangible chattel." *Id.* The *Fairbanks* court then rejected the argument that ancillary services could bring life insurance within the reach of the statute:

> [A]ncillary services are provided by the sellers of virtually all intangible goods—investment securities, bank deposit accounts and *loans,* and so forth. The sellers of virtually all these intangible items assist prospective customers in selecting products that suit their needs, and they often provide additional customer services related to the maintenance, value, use, redemption, resale, or repayment of the intangible item. Using the existence of these ancillary services to bring intangible goods within the coverage of the [CLRA] would de-

---

**8.** In particular, Plaintiffs allege: Wells Fargo's acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in that they misrepresent the particular standard, quality or grade of the goods, pursuant to § 1770(a)(7); Wells Fargo's acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in that they represent that a transaction confers or involves rights, reme-dies, or obligations which it does not have or involve, or which are prohibited by law, pursuant to § 1770(a)(14); and Wells Fargo's acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in that they represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not, pursuant to § 1770(a)(16).

feat the apparent legislative intent in limiting the definition of "goods" to include only "tangible chattels." We conclude, accordingly, that the ancillary services that insurers provide to actual and prospective purchasers of life insurance do not bring the policies within the coverage of the [CLRA].

*Id.*, 92 Cal.Rptr.3d 279, 205 P.3d at 206 (emphasis added).

Notably, Plaintiffs did not purchase the servicing of their mortgages independently. Instead, the servicing accompanied their receipt of a home mortgage loan. The California Supreme Court clearly indicated that loans such as home mortgages, even where they are accompanied by ancillary services, do not come within the meaning of goods or services in the CLRA. Indeed, the one other district court to consider the application of *Fairbanks'* reasoning to claims challenging mortgage loan servicing under the CLRA dismissed the plaintiff's claims after concluding that the *Fairbanks* court indicated "that loans are intangible goods and that ancillary services provided in the sale of intangible goods do not bring these goods within the coverage of the CLRA." *Consumer Solutions REO, LLC v. Hillery,* 658 F.Supp.2d 1002, 1016 (N.D.Cal.2009). The Court does not find the cases cited by Plaintiffs for the proposition that the CLRA applies to mortgages persuasive. *See Hernandez v. Hilltop Fin. Mortgage, Inc.,* 622 F.Supp.2d 842, 850 (N.D.Cal.2007); *Jefferson v. Chase Home Fin. LLC,* 2007 WL 1302984, at *3 (N.D.Cal. May 3, 2007); *In re Ameriquest Mortgage Co.,* No 05–CV–7097, 2007 WL 1202544, at *6 (N.D.Ill. Apr. 23, 2007). Each case was decided before the *Fairbanks* decision, and each relied on the theory, subsequently rejected by the *Fairbanks* court, that loans were covered by the CLRA by way of their ancillary management services. *Id.* Based on the reasoning of *Fairbanks*, the Court concludes that mortgages, and their accompanying servicing, are not "goods" or "services" within the meaning of the CLRA. Accordingly, Wells Fargo's motion to dismiss Count IV is granted.

### C. RICO Claims

 In addition to the various state violations, Plaintiffs assert that Wells Fargo violated RICO, 18 U.S.C. § 1962(c), when perpetrating the alleged fraudulent scheme. Section 1962(c) makes it unlawful "for any person employed by or associated with an enterprise engaged in, or the affairs of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." To prevail on a RICO claim under § 1962(c), Plaintiffs must demonstrate "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." *Sedima v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Plaintiffs' Complaint addresses each of these elements, alleging that Wells Fargo and property inspection vendors formed an association-of-fact "enterprise" for the purposes of RICO (hereinafter "Wells Fargo Enterprise"), that WFC and WFB both violated RICO by conducting, or aiding and abetting the other Defendant in conducting, the affairs of the Wells Fargo Enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c), and that Wells Fargo's multiple alleged acts of mail and wire fraud constitute the "pattern of racketeering activity" for the purposes of RICO. Wells Fargo presents two challenges specific to Plaintiffs' RICO claims: (1) the alleged RICO enterprise does not present a necessary connection to the late fees; and (2) there is no private cause of action for aiding and abetting a RICO violation.

1. *Nexus between the predicate acts, RICO conduct, and the RICO enterprise.*

 A plaintiff asserting a RICO claim must plead that the pattern of racketeering activity occurred through the "conduct of a RICO enterprise." *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275. The Complaint sets forth that Wells Fargo and the property inspection vendors formed an association-in-fact enterprise which fulfills the statutory requirements of a RICO enterprise. Wells Fargo argues that Plaintiffs cannot establish a RICO claim based on the late fees because the alleged RICO enterprise only encompasses the property inspections fees.[9] As an initial matter, Wells Fargo misconstrues Plaintiffs allegations. Plaintiffs pleaded that Wells Fargo was engaged in a cohesive scheme in which the predicate acts of mail and wire fraud involved misrepresentations of both excessive late fees and inspection fees. As such, the fraud involved in charging late fees is not so easily divisible from the allegations of fraud involving property inspection fees.

 Moreover, the Court disagrees with Wells Fargo's suggestion that RICO liability only attaches to activities directly performed by the RICO enterprise. RICO makes it "unlawful for any person employed by or associated with any enterprise[10] engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The plain language of the statute sets forth that liability under § 1962(c) arises from the actions of an individual, not the actions of the RICO enterprise. *See United Health-Care Corp. v. Am. Trade Ins. Co., Ltd.*, 88 F.3d 563, 569 (8th Cir.1996) (citing *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275) ("[A] plaintiff [must] establish (1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4) defendant's actions constitute a pattern of racketeering activity."). Of course, the individual defendant must have an association with the RICO enterprise, and also conduct or participate in the affairs of the RICO enterprise through a pattern of racketeering activity to be liable under RICO, but the statute does not require that the RICO enterprise be the primary actor committing the racketeering activities. Indeed, the Supreme Court has noted the open-ended nature of the causal connections required between the enter-

9. Wells Fargo includes its "enterprise" argument in a section entitled "Additional Defects in RICO Claims Regarding Late Fees," which also argues that Plaintiffs failed to allege "why" or "how" the late fees were "unauthorized, excessive, or otherwise wrongful, let alone fraudulent." Mot. to Dismiss at 12. As discussed in greater detail below, Plaintiffs have clearly constructed a picture of a scheme to increase Wells Fargo's profits by charging fees that both increase the amount collected in late fees and increase the possibility that Wells Fargo will be able to collect additional late payments. In addition, the Complaint states that the late fees were excessive independent of the property inspection fees because Plaintiffs were continuously charged late fees in the months following a missed payment, regardless of successive payments.

10. Section 1961(4) broadly defines "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). RICO's definition section contains no provisions that would restrict either the "enterprise" element or the broad scope of liability established in 18 U.S.C. § 1962(c).

prise, a defendant, and the alleged predicate acts permitted by RICO:

> RICO both protects a legitimate "enterprise" from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an "enterprise" (whether legitimate or illegitimate) as a "vehicle" through which "unlawful ... activity is committed." A corporate employee who conducts the corporation's affairs through an unlawful RICO "pattern ... of activity," § 1962(c), uses that corporation as a "vehicle" whether he is, or is not, its sole owner.[11]

*Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 164–65, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (quoting *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) and *Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)). RICO liability may attach where the RICO enterprise is neither criminal nor the cause of the injury alleged by the plaintiff. *See Reynolds v. Condon,* 908 F.Supp. 1494, 1510 (N.D.Iowa 1995) (concluding after a review of Supreme Court and Eighth Circuit precedent that "the [RICO] enterprise need only have a common or shared purpose, which may be legal or otherwise, and may be related to the predicate acts or not, . . . ."); *cf. Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.,* 528 F.3d 1001, 1027 (8th Cir.2008) (noting the unresolved question of "whether the common purpose under RICO must be fraudulent"). Further, in interpreting RICO, the Court must be mindful that "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle v. United States,* —— U.S.

—— , 129 S.Ct. 2237, 2242, 173 L.Ed.2d 1265 (2009) (quoting RICO, Pub. L. No. 91–452, § 904(a), 84 Stat. 947 (1970)).

Congress clearly intended RICO liability to extend to situations where one entity directs the formation of a RICO enterprise and then makes use of the association to further a pattern of unlawful activity, even where portions of the unlawful activity do not issue directly from the RICO enterprise. Here, Plaintiffs allege that Wells Fargo conducted the affairs of the enterprise by ordering the property inspections, used its association-in-fact business arrangement with the property inspection vendors to conduct its unlawful practice of imposing excessive fees on the mortgagors, and engaged in mail and wire fraud to collect payments for the enterprise's benefit. Compl. ¶¶ 1, 73, 75. Accordingly, the Court concludes that the RICO enterprise as pleaded by Plaintiffs satisfies the requirements set forth under 18 U.S.C. § 1962(c).

### 2. *Private RICO claim for aiding and abetting.*

 Wells Fargo argues that Count II of the amended complaint must be dismissed because a private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Eighth Circuit has not yet had occasion to consider this question, but the majority of recent case law, including the sole district court in this Circuit to address the issue, holds that RICO does not recognize civil liability for persons who

---

11. In support of this broad pronouncement, the Supreme Court observed that RICO's statutory history "not only refers frequently to the importance of undermining organized crime's influence upon legitimate businesses but also refers to the need to protect the public from those who would run 'organization[s] in a manner detrimental to the public interest.'" *Id.* (quoting S.Rep. No. 91–617, at 82).

merely aid and abet the underlying predicate offenses. *See, e.g., Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.,* No. 04–0074, 2005 WL 1279046, at *4 (W.D.Mo. May 25, 2005). The Court agrees.

In *Central Bank of Denver,* the Supreme Court held that there is no implied right of action for aiding and abetting liability under the Securities Exchange Act § 10(b). The Supreme Court observed that "Congress knew how to impose aiding and abetting liability when it chose to do so," and that "the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation." *Central Bank of Denver,* 511 U.S. at 177, 114 S.Ct. 1439. Further, it noted that

> Congress has not enacted a general civil aiding and abetting statute.... [W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

*Id.* at 181–82, 114 S.Ct. 1439. The Court also rejected the proposition that a private aiding and abetting right of action could be inferred from 18 U.S.C. § 2, the general criminal aiding and abetting statute. *Id.* at 190, 114 S.Ct. 1439.

Applying this same reasoning to § 1962(c) of the RICO statute, there is no basis to conclude that Congress created a private civil right of action for aiding and abetting a RICO violation under § 1962(c). The text of § 1962(c) does not reference "aiding and abetting." Further, Supreme Court case law indicates that the most encompassing phrase, "participate indirectly," cannot be read to include aiding and abetting liability. *See Reves v. Ernst & Young,* 507 U.S. 170, 178, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (noting that "participate," as used in § 1962(c), has a narrower meaning than "aid and abet"); *see also Central Bank of Denver,* 511 U.S. at 175, 114 S.Ct. 1439 (finding that the phrase "directly or indirectly," as used in § 10b of the Securities Exchange Act, did not suffice to impose aiding and abetting liability).

Moreover, the structure of the RICO statutory provisions which create civil liability do not support a conclusion that Congress intended that aiding and abetting be swept into § 1962(c). Congress set forth four possible violations in § 1962. The first three prohibitions address acts directly involved with a pattern of racketeering activity. *See* § 1962(a)-(c) (prohibiting (a) the investment of income derived from a pattern of racketeering activity in an enterprise, (b) the acquisition or maintenance, through a pattern of racketeering activity, of an interest in, or control of, an enterprise, and (c) the participation in, or conduct of, an enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt). The fourth potential violation, found in § 1962(d), provides the only alternative of establishing RICO liability where a wrongdoer has not committed a pattern of racketeering activity— but that liability is limited to RICO conspirators. The Court concurs with other courts that have concluded that this structure indicates that Congress intended § 1962(c) to reach only actors directly involved in racketeering activities, and not aiders and abettors. *See Dept. of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.),* 924 F.Supp. 449, 476 (S.D.N.Y.1996) (providing an extensive analysis of the statutory text of § 1962 and concluding that "there is no reason to believe that the omission of language in RICO covering aiders and abettors was inadvertent"); *Pa. Ass'n of Edwards Heirs v. Rightenour,* 235 F.3d 839, 840 (3d Cir.2000) ("[B]ecause RICO's statutory text does not provide for a private cause of action for aiding and abetting and 18 U.S.C. § 2 cannot be used

to imply this private right, no such cause of action exists under RICO.").

Plaintiffs acknowledge the cases cited by Wells Fargo in support of its position, but point to three cases that they assert have concluded that *Central Bank of Denver* need not be extended to the RICO context: *Otero v. Vito,* No. 5:04–cv–211, 2007 WL 445277, at \*4 (M.D.Ga. Feb. 6, 2007); *In re Managed Care,* 298 F.Supp.2d 1259, 1272 (S.D.Fla.2003); *Betulius v. Hanna,* No. 4:96–cv–92, 1996 WL 900413, at \*4 (W.D.Mich. Dec. 10, 1996). After reviewing these cases, the Court remains unpersuaded. *Otero v. Vito* is wholly inapplicable to the federal RICO statute since the *Otero* court was presented with claims under the Georgia RICO Act, which expressly sets forth liability for aiding and abetting in the commission of the predicate act. *See* 2007 WL 445277, at \*3 (quoting Ga. Code Ann. § 16–2–20(b)(3), which states: "A person is concerned in the commission of a crime" if he "[i]ntentionally aids or abets in the commission of the crime").

The second case cited by Plaintiffs, *In re Managed Care,* does not squarely address whether a plaintiff can assert a civil aiding and abetting cause of action under RICO. 298 F.Supp.2d at 1285–86 (hereinafter *"In re Managed Care II "*). The strained discussion in *In re Managed Care II* is given context by the same court's 2001 analysis specifically discussing the viability of a civil aiding and abetting cause of action under RICO. *See In re Managed Care,* 135 F.Supp.2d 1253, 1267 (S.D.Fla.2001) (hereinafter *"In re Managed Care I "*). In *In re Managed Care I,* the district court found merit in the argument that *Central Bank of Denver* implicitly overruled the Eleventh Circuit precedent that had concluded RICO contains an implied cause of action for aiding and abetting. *Id.* (citing *Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1410 (11th Cir.1994)). Howev-

er, because *Cox* had not been explicitly overruled by either the Supreme Court or the Eleventh Circuit, the district court stated that it must follow controlling Eleventh Circuit precedent and allow plaintiffs to assert a claim for aiding and abetting a RICO violation. *Id.* The Court does not consider the *In re Managed Care II* court's equivocal adoption of aiding and abetting liability persuasive authority.

Finally, in *Betulius v. Hanna,* the Western District of Michigan conclusorily states in dicta that "one who aids and abets two predicate acts can be civilly liable under RICO." 1996 WL 900413, at \* 4. *Betulius* cites Eleventh and Third Circuit Court of Appeal decisions, but provides no reasoning for why such a proposition stands in light of the Supreme Court's decision in *Central Bank of Denver. Id.* (citing *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d Cir.1995); *Cox,* 17 F.3d at 1410; *Petro–Tech, Inc. v. W. Co. of N. Am.,* 824 F.2d 1349, 1356 (3d Cir.1987)). The persuasiveness of the *Betulius* court's dicta is further reduced because the Third Circuit has expressly rejected the reasoning on which the *Betulius* court relies. *See Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 657 (3d Cir.1998) ("[W]e are convinced that a private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision in *Central Bank of Denver* . . . ."); *Rightenour,* 235 F.3d at 840 ("[B]ecause RICO's statutory text does not provide for a private cause of action for aiding and abetting and 18 U.S.C. § 2 cannot be used to imply this private right, no such cause of action exists under RICO."). Though the Eleventh Circuit does not appear to have rejected the proposition cited in *Betulius,* neither has it affirmed the proposition since *Central Bank of Denver* and its decision in *Cox.*

Though Plaintiffs have presented some authority that supports the use of a civil cause of action for aiding and abetting a RICO violation, none of the cases provide persuasive reasoning from which the Court can conclude *Central Bank of Denver* should not be extended to the RICO context. Accordingly, the Court concludes that Plaintiffs' claim that Wells Fargo violated RICO by way of aiding and abetting (Count II) must be dismissed.

## D. Are a RICO, UCL, and SDCL scheme to defraud adequately pleaded?

Finally, the Court addresses whether Plaintiffs' three remaining Counts, the RICO, UCL, and SDCL claims, satisfy the pleading requirements of Rule 8(a) and 9(b).[12] To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs' RICO and state consumer protection claims must set forth enough facts to state a claim that plausibly gives rise to an entitlement of relief. Fed. R. Civ. Proc. 8(a). In addition to the general Rule 8(a) pleading requirement, "[when] alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The Rule 9(b) pleading standard is interpreted " 'in harmony with the principles of notice pleading.' " *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir.2009) (citing *Schaller Tel. Co. v.*

*Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir.2002)).

 A party alleging fraud must typically identify the "who, what, where, when, and how" of the alleged fraud. *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 888 (8th Cir. 2003). This requirement is designed to enable defendants to respond "specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). The level of particularity required depends on the nature of the case and the relationship between the parties, *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957), but generally, a plaintiff must plead " 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.' " *Abels*, 259 F.3d at 920 (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982)). "Allegations of a fraudulent scheme involving a course of conduct for an extended period of time, or a series of transactions, need not recite the fact of each transaction in detail." *Trooien v. Imeson*, Civ. No. 09–507, 2009 WL 1921685, at *2 (D.Minn. July 1, 2009) (citing *Bale v. Dean Witter Reynolds, Inc.*,

---

**12.** Plaintiffs argue that the Rule 9(b) standard only applies to the RICO claims (Counts I and II) and the common law fraud, misrepresentation, false and/or deceptive practices claims (Count VII). However, courts have generally found that when claims brought under consumer protection laws are based on allegedly fraudulent acts, the heightened Rule 9(b) standard should be applied. *See Tuttle v. Lorillard*, 118 F.Supp.2d 954, 963 (D.Minn. 2000) (noting that Rule 9(b) applies to Minnesota's consumer protection statutes where "the gravamen of the complaint is fraud"); *cf. Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511–12 & n. 5 (2d Cir.2005) (distinguishing deceptive trade practices un-

der the New York Consumer Protection Act from fraud because a deceptive trade practice claim lacks the elements of scienter and reliance and stating that the historical rationales for requiring particularity for claims of fraud do not apply to deceptive trade practices). Here, Plaintiff's consumer protection claims closely follow the form of the RICO and common law fraud claims. Each of the Counts set forth by Plaintiffs attributes fraudulent or intentionally deceptive acts to Wells Fargo, and then asserts that those acts violated various consumer protection statutes. Because they have pleaded their claims in this manner, Plaintiffs are required to meet the Rule 9(b) particularity requirement for Counts I–VIII.

627 F.Supp. 650, 652 (D.Minn.1986)). Allegations pleaded on information and belief usually will not satisfy the Rule 9(b) particularity requirement, but,

> [w]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge ... such allegations may be pleaded on information and belief. Rule 9(b) is deemed satisfied if the allegations are accompanied by a statement of facts on which the belief is founded.

*Drobnak*, 561 F.3d at 783–84 (internal citations omitted). In addition, plaintiffs cannot not be expected to provide highly specific information regarding information within the exclusive control of a defendant. *Abels*, 259 F.3d at 920–21.

■ The scienter element of fraud, however, need only be alleged generally. Fed.R.Civ.P. 9(b). Nevertheless, pleadings of intent must satisfy the pleading requirements of Rule 8(a)(2). *See Iqbal*, 129 S.Ct. at 1954. Accordingly, "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir.1995). The Court must consider whether the factual allegations give rise to a reasonable inference of the requisite scienter. *See Iqbal*, 129 S.Ct. at 1949.

■ Plaintiffs' RICO pleadings are predicated upon alleged acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. "To establish mail fraud, the plaintiff must show the existence of a plan or scheme to defraud, that it was foreseeable that the defendant's scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir.1989). "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-

technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Id.* "A plaintiff may, but need not, allege that a defendant made misrepresentations of fact." *Abels*, 259 F.3d at 918. "[T]he term 'scheme to defraud' connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud." *Atlas Pile Driving*, 886 F.2d at 991 (quoting *United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir. 1976)).

■ The UCL imports violations of other laws and makes them independently actionable as unfair business practices. *See Cel–Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Therefore, an adequately pleaded RICO violation will be sufficient to support a claim under the unlawful prong of the UCL. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 108 Fed.Appx. 497, 497–98 (9th Cir.2004).

■ A violation of SDCL § 37–24–6 arises from deceptive practices in connection with the sale or advertisement of merchandise. *Sisney v. Best Inc.*, 754 N.W.2d 804, 811 (S.D.2008). "Any person who claims to have been adversely affected by any act or a practice declared to be unlawful by § 37–24–6 shall be permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or practice." SDCL § 37–24–31. A SDCL §§ 37–24–6 and 37–24–31 claim "require[s] proof of an intentional misrepresentation or concealment of a fact on which plaintiff relied and that caused an injury to plaintiff." *Nw. Pub. Serv. v. Union Carbide Corp.*, 236 F.Supp.2d 966, 973–74 (D.S.D.2002). "The broad statutory language of the South Dakota Deceptive

Trade Practices Act protects more than only consumers. However, to recover ... a plaintiff must have relied on the alleged misrepresentation." *Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*, No. CIV. 06–4166, 2009 WL 3150984, at *7 (D.S.D. Sept. 28, 2009) (citing *Moss v. Guttormson*, 551 N.W.2d 14 (S.D.1996) and *Nygaard v. Sioux Valley Hospitals & Health Sys.*, 731 N.W.2d 184 (S.D.2007)).

■ Wells Fargo vehemently argues that Plaintiffs' RICO and state consumer

protection claims are a billing dispute mispleaded as fraud claims. The Court is not persuaded by Wells Fargo's attempt to construe Plaintiffs' allegations as a contract dispute. Though the basis of Plaintiffs' relationship to Wells Fargo was established by contract, Plaintiffs have alleged that Wells Fargo's practices constitute a systematic scheme to charge excessive fees and conceal those fees from mortgagors. Contrary to Wells Fargo's characterization of case law on the topic,[13]

13. Wells Fargo provided voluminous citations for this argument. The majority of the cases present conclusions based on a complete factual record and are inapplicable to the Court's consideration of the present Motion to Dismiss. *See Schoedinger v. United Healthcare of Midwest, Inc.*, 557 F.3d 872, 878–79 (8th Cir.2009) (reviewing evidence presented at trial to conclude that plaintiff had failed to present proof of intentional deceit); *Westways World Travel, Inc. v. AMR Corp.*, 265 Fed. Appx. 472, 474 (9th Cir.2008) (concluding after a review of the record that the communications at issue did not constitute a " 'scheme or artifice,' nor d[id] they evidence a specific intent to defraud"); *Sanchez v. Triple–S Mgmt., Corp.*, 492 F.3d 1, 11 (1st Cir. 2007) (affirming district court's summary judgment based on expert's and plaintiff's testimony); *All Direct Travel Serv., Inc. v. Delta Air Lines, Inc.*, 120 Fed.Appx. 673, 675–76 (9th Cir.2005) (affirming summary judgment in favor of the defendant on RICO claims because the use of the disputed documents was affirmatively permitted by a valid legal agreement between the parties); *Chris Albritton Constr. Co. v. Pitney Bowes, Inc.*, 304 F.3d 527, 530–31, 532 (5th Cir.2002) (affirming the district court's grant of summary judgment in favor of defendant because the plaintiff presented insufficient evidence to show a question of material fact that defendant acted with an intent to defraud); *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir.1999) (affirming district court's conclusion that the plaintiff "did not adduce evidence from which a trier of fact properly could find a pattern of predicate acts"); *Johnson Enters. of Jacksonville, Inc.*, 162 F.3d at 1318–19 (sustaining the district court's grant of judgment as a matter of law in favor of defendants on plaintiff's RICO

claims, noting the lack of evidence presented at trial to support each of the claims).

In the few cases cited by Wells Fargo that consider the adequacy of a plaintiff's pleadings in the context of a motion to dismiss, the deciding court performed an examination of the pleadings and found that the plaintiff had failed to sufficiently plead an element required for a claim of fraud. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940–42 (9th Cir.2006) (affirming the district court's conclusion that the use of prelitigation demand to settle letters was immunized from RICO liability under the *Noerr–Pennington* doctrine because the letters were not a sham, but also noting there was no intent to deceive where the basis for the predicate act of mail and wire fraud was "the sending of a prelitigation demand to settle legal claims that do not amount to a sham"); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791–94 (1st Cir.1990) (concluding that when the alleged scheme turned on a contract between parties who both knew that the provisions were illegal, and the only deceptive act was to submit a false version of that contract to a regulating body, the pleading "fail[ed] to show that the [defendants] engaged in a scheme to defraud *anyone of property or money* within the meaning of the mail and wire fraud statutes" (emphasis added)); *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152–53 (6th Cir.1987) (affirming dismissal on the grounds that the complaint failed to identify with particularity a false statement that was "reasonably calculated to deceive persons of ordinary prudence and comprehension" or to allege that plaintiffs relied on any false statement).

Particularly troublesome to the Court are Wells Fargo's several citations to cases that

it is well settled that allegations that a defendant engaged in deceptive business practices can support a claim for breach of contract or fraud, even when the defendant's actions are also contrary to the terms of a valid contract. *See, e.g., Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526–27, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (noting that while the plaintiffs' allegations could not sustain their statutory claim, "such deceptive diversion of business to the nonunion portion of a so-called 'double-breasted' operation might constitute a breach of contract, an unfair labor practice, or perhaps even a common-law fraud or deceit"); *Am. Med. Ass'n v. United Healthcare Corp.,* 588 F.Supp.2d 432, 443 (S.D.N.Y.2008) (holding that plaintiffs sufficiently alleged violations of RICO where the complaint stated that the defendant healthcare provider had made false representations regarding fees due under medical plans); *AB Mauri Food, Inc. v. Harold,* No. 4:07CV811, 2008 WL 878451, at *2 (E.D.Mo. Mar. 27, 2008) (finding that the plaintiffs had alleged "intentional, deliberate and planned concealment of the conduct, whether or not the conduct was itself a breach of the parties' agreement," such that the allegations were differentiated from a mere breach and "satisfie[d] the RICO predicate act requirement").

Plaintiffs have pleaded that Wells Fargo engaged in a systematic course of conduct to defraud mortgage borrowers. Plaintiffs allege that Wells Fargo has managed and administered its mortgage servicing through the use of general computer software packages with little or no human intervention since at least 2001, and that the scheme was in existence when they obtained their mortgages. Compl. ¶¶ 3, 26, 37. Plaintiffs describe how they believe the excessive fees are calculated within the Fidelity MSP program. *Id.* ¶¶ 26–35. They lay forth the process by which the Fidelity MSP system automatically generates property inspection requests, sends them to property inspection vendors, allows the property inspection vendor to upload its report, and charges a property inspection fee to the mortgagor's mortgage account. *Id.* ¶¶ 29–33. They note that after the first property inspection is triggered by a default, the system will continue to generate property inspection orders every 20–45 days until the mortgagor cures the default. *Id.* ¶ 34. Plaintiffs also assert that the computer system was programmed to first pay all outstanding fees and costs before satisfying the interest and principal due, resulting in late fees after a missed payment, regardless of continued payment. *Id.* ¶¶ 3, 52–53, 64–65; Tr. at 37, 48.

Plaintiffs refer to contract language that they assert restricts fees to those reason-

did not even arrive at the issue for which they were cited. *See Lum v. Bank of Am.,* 361 F.3d 217, 225–227 (3d Cir.2004) (dismissing RICO claims because conclusory allegations that did not specify date, time, or place of misrepresentation failed to satisfy Rule 9(b)); *Grauberger v. St. Francis Hosp.,* 169 F.Supp.2d 1172, 1176–77 (N.D.Cal.2001) (concluding that a state statute expressly governed the disputed action and that, since the defendant's position was a plausible interpretation of the statute, there was no fraud to support a RICO claim); *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346–54 (S.D.N.Y.1998) (ruling that the complaint failed to state a RICO claim because it did not properly allege the RICO enterprise element). The parties are reminded that Local Rule 83.1 requires all lawyers appearing in the Southern District of Iowa to comply with the Iowa Rules of Professional Conduct, including Rule 32:3.3(a)(1) which states: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

ably necessary to protect the interest of the lender. Compl. ¶ 21; Tr. at 37; *see also* Clerk's No. 52, Exs. C, E, H (¶¶ 7, 9 in each). They also point to provisions that prescribe particular procedures for assessing late fees.[14] Compl. ¶ 21; Tr. at 37. Plaintiffs assert that the manner in which Wells Fargo ordered property inspections was not reasonable,[15] and that sequential late fees charged for several months following a single missed payment violated specific terms of their mortgage agreements. Compl. ¶¶ 3, 52–53; 64–65; Tr. at 37, 48.

Plaintiffs allege that Wells Fargo repeatedly sent Plaintiffs materially false and misleading agreements, contracts and monthly mortgage statements by mail and wire. Compl. ¶ 41. Indeed, Plaintiffs have pleaded specific information regarding multiple monthly statements that charged Plaintiffs the allegedly excessive fees, including amounts and dates.[16] *Id.* ¶¶ 48–53, 59–65. Plaintiffs state that after the Youngs and the Huyers failed to make payment on their loans on the date due, they received several mortgage statements which listed assessments for "other charges" in amounts between $10.00 and $47.50. *Id.* ¶¶ 49, 61. Plaintiffs assert upon information and belief that these "other charges" refer to property inspection fees.[17] *Id.* ¶¶ 50, 62. Further, they

---

**14.** Each mortgage explains that payments will be applied in the following order of priority: (1) interest due under the Note; (2) principal due under the Note; (3) amounts dues [for escrow items]; (4) late charges; (5) other amounts due under the mortgage; and (6) any remaining amount should reduce the principal. Clerk's No. 52, Exs. C, E, H (¶ 2 in each).

In addition, each mortgage note provides:
If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.
Clerk's No. 52, Exs. A, B, D (¶ 7 in each).

**15.** Wells Fargo cites cases holding that the use of property inspections to preserve a lender's security is reasonable. *See Walker*, 121 Cal.Rptr.2d at 79, *Majchrowski v. Norwest Mortgage, Inc.*, 6 F.Supp.2d 946 (N.D.Ill. 1998), and *Mann v. Chase Manhattan Mortgage Corp.*, No. Civ. A. 00–192–T, 2002 WL 32157516 (D.R.I. Mar. 7, 2002). It is not clear if Wells Fargo cites these cases only for the proposition that property inspections must always be reasonable, or if Wells Fargo is citing the cases to counter Plaintiffs' factual allegations that suggest the requisite intent to defraud. The Court does not find the cases persuasive on either account. The question of whether the property inspection fees are reasonable presents a factual inquiry that cannot be addressed when the Court must accept as true all of the factual allegations contained in the Complaint. Further, the facts vary so substantially between those cases and the present action, the Court does not regard the findings in those cases as applicable to the issue of intent in the scheme alleged by Plaintiffs.

**16.** Wells Fargo suggests that the Court should interpret Plaintiffs' allegations to state that the mortgage statements were implicit certifications that should be construed as misrepresentations of law, rather than misrepresentations of fact. Wells Fargo then states that misrepresentations of law are not actionable under RICO and several state common law fraud statutes. Plaintiffs' allegations throughout the Complaint frame the mortgage statements as assertions of fact. The mere fact that the parties disagree about whether the fees set forth in the statements were unlawful does not make the bills misrepresentations of law. The Court, accordingly, does not agree with Wells Fargo's characterization of typical monthly statements as statements of law.

**17.** Given the additional facts Plaintiffs have pleaded regarding the process by which property inspections are ordered, and the fact that the exact nature of the "other charges" is information within the sole control of Wells Fargo, the Court accepts Plaintiffs' assertion upon information and belief that the "other charges" represent property inspection fees.

note that for each of the Huyers' two mortgages serviced by Wells Fargo, the Huyers received two statements, and each statement listed "other charges" incurred on the same date. *Id.* ¶¶ 61, 62. In addition, Plaintiffs identify several statements sent to the Youngs and the Huyers during the same months, and months directly following, that also list "unpaid late charge(s)" that Plaintiffs allege were wrongly assessed. *Id.* ¶¶ 53, 65.

### 1. *Are the RICO, UCL, and SDCL pleadings sufficiently particular?*

In gauging the level of detail required by Rule 9(b), the Court finds the Eighth Circuit's discussion in *Abels* particularly helpful. *See* 259 F.3d at 910. In *Abels*, the farmers asserted that a company selling commodities futures and its manager violated RICO when marketing futures. *Id.* at 913. The farmers' amended complaint described the relationship between the futures commission merchant and its broker, the manager's solicitations directed at the farmers, the proposed futures contracts, and the farmers' reliance on the manager's representations. *Id.* at 913–15. The Eighth Circuit held that the farmers' allegations were sufficient to allow a jury to infer that the defendants' normal business activities constituted a RICO enterprise, to plead that a pattern of racketeering acts existed, and to plead circumstances constituting fraud. *Id.* at 917–21. In particular, the Eighth Circuit found the complaint was sufficient to satisfy Rule 9(b) because:

> The complaint sets forth times and places of numerous meetings, marketing seminars, and private conversations in which misrepresentations are claimed to have been made. It names the parties to those communications and describes the content of the claimed false statements. It names the plaintiffs who allegedly relied on these statements in

deciding to begin writing [futures] contracts with Buffalo Center Elevator, and it states the specific monetary damage to each plaintiff that is claimed to have resulted from that venture.

*Id.* at 920. This degree of particularization was sufficient because, prior to discovery, plaintiffs cannot not be expected to have highly specific information regarding the defendants' internal communications. *Id.* at 920–21 ("We think it only fair to give them [the benefit of discovery] before requiring them to plead facts that remain within the defendants' private knowledge.").

■ Here, Plaintiffs pleaded facts setting forth when the billing statements were received, who received them, what was contained in the bills, and why they believe those statements are materially deceptive. In addition, they describe the logic used by Fidelity MSP system to calculate the fees and generate the bills. The Court notes that the Complaint lacks specific facts regarding who at Wells Fargo programmed the Fidelity MSP, and how they constructed the program to calculate the fees in this manner. However, because Wells Fargo has exclusive control over its internal communications and the fee assessment rubric, Plaintiffs cannot be expected to provide particularized details regarding Wells Fargo's design of the system before discovery. The facts in the Complaint explain with particularity how Wells Fargo executed the alleged scheme to charge excessive servicing fees, as well as how Wells Fargo regularly used the mails to send out mortgage statements in carrying out the fraudulent scheme. Accordingly, the Court concludes that the facts constituting the fraudulent scheme are plead with sufficiently particularity with respect to the RICO claim, predicated upon mail and wire fraud, to allow Wells Fargo to respond to the Plaintiffs allega-

tions of fraud. It must also follow that the pleading of the UCL claim, which may "borrow" a violation of the mail and wire fraud statute, satisfies Rule 9(b) particularity requirement.

■ The Court, however, cannot conclude that Plaintiffs have set forth particularized facts regarding deceptive acts connected to the sale of Wells Fargo's mortgage lending services, as required to state a claim under the SDCL. A SDCL violation requires a misrepresentation or concealment in connection with either the sale or the advertisement of merchandise. Plaintiffs pleaded that Wells Fargo's mortgage lending services are merchandise for the purposes of the SDCL. They have failed to plead any particularized details relating to the sale or advertisement of Wells Fargo's mortgage lending services, much less particularized facts alleging that Wells Fargo made misrepresentations or concealments in connection to the sale of those services. Because Plaintiffs have not pleaded the SDCL claim with the particularity required by Rule 9(b), Count IV is dismissed.

2. *Pleading of intent to defraud satisfies Rule 8(a)(2).*

■ To successfully state a claim under RICO, Plaintiffs also must plead facts that plausibly support an inference that Wells Fargo had the requisite scienter to commit mail or wire fraud. If Plaintiffs have alleged facts which support a reasonable inference of intent to commit mail or wire fraud, both the RICO and the UCL claims will survive. The "intent to defraud" required for a violation of federal mail and wire fraud statutes can be satisfied by a showing that the defendant acted with intention or with reckless disregard to the interest of the plaintiff. *See United States v. DeRosier,* 501 F.3d 888, 898 (8th Cir.2007) (affirming the use of a wire fraud

instruction that used the phrase "in reckless disregard of the interest of" because "the 'reckless disregard' standard is an acceptable specification of the term 'intent to defraud'"); *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 768 (8th Cir.1992) ("Intent to defraud need not be evinced by the defendant's avowed intent to bilk members of the public; it can also be demonstrated when the defendant recklessly disregards whether his representations are true."). "No single fact need demonstrate the defendant's intent; rather, intent to defraud can be discerned by examining the totality of the circumstances surrounding the defendant's activities." *Diamonds Plus, Inc.,* 960 F.2d at 768. An allegation of fraud will "giv[e] rise to a strong inference of scienter [if] defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 661 (8th Cir.2001) (describing factual allegations that may meet the "strong-inference-of-scienter" standard adopted by Congress in the Private Securities Litigation Reform Act). In addition, allegations demonstrating the defendant had motive and opportunity to derive a concrete benefit from the alleged fraud may support an inference that a defendant had the requisite scienter for fraud. *See In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 894 (8th Cir.2002) (holding that where an individual will benefit to an unusual degree, the heightened pleading standard for motive in a securities fraud action is sufficiently pled); *see also Green Tree Financial Corp.,* 270 F.3d at 660 ("[M]otive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard.").

Plaintiffs have alleged that Wells Fargo knew, or recklessly disregarded the mortgagors' interests when it charged unreasonable, improper, and unlawful fees. However, they have not pleaded facts directly demonstrating Wells Fargo's intent when it programmed the Fidelity MSP software to order property inspections and to charge the property inspection and late fees. Since legal allegations are not entitled to the presumption of truth, the Court must consider whether the facts pleaded support a reasonable inference that Wells Fargo acted with the intent required for a mail or wire fraud violation.

As noted above, Plaintiffs allege that their mortgage contracts set forth the terms by which Wells Fargo could charge them property inspection and late fees. They also cite multiple instances when Wells Fargo charged them fees that they contend violate the terms of their agreements. The Court finds it plausible that a portion of the late fees were improper, e.g., those resulting from the misapplication of the borrowers' payments, and that at least some of the property inspection fees were unreasonable, e.g., those charging for property inspections twice on the same day. In addition, the Court must accept Plaintiffs' factual allegations regarding Wells Fargo's process for billing as true at this state of the litigation. Consequently, the Court must conclude for purposes of the Motion to Dismiss that Wells Fargo knew the contract terms regarding mortgage servicing fees, yet systematically charged borrowers fees that did not comply with their mortgage contracts. Three explanations for this disparity are possible: (1) the overcharges derived from a mistake during the programming of the Fidelity MSP system; (2) Wells Fargo acted with reckless disregard toward the mortgage borrowers when it designed the Fidelity MSP sys-

tem; or (3) Wells Fargo deliberately designed the Fidelity MSP system to overcharge borrowers.

Though it is possible the over-billing derived from a mistake, the Court finds it reasonable to infer that Wells Fargo acted with reckless disregard or intention when it designed the Fidelity MSP system. In *Schoedinger v. United Healthcare of Midwest, Inc.*, the Eighth Circuit observed that it might be fraud to intentionally, or with reckless disregard, send billing statements that contain improperly calculated fees with the knowledge that a substantial number of claimants would not challenge the information in the statement. 557 F.3d 872, 879 (8th Cir.2009). Here, Wells Fargo had reason to know that some of the fees it was charging were not permissible under the borrowers' mortgage contracts. Further, the manner in which the charges were presented in the statements, under the generalized heading "other fees," supports an inference that Wells Fargo sought to conceal the nature of the fees. Compl. ¶¶ 3, 25, 51, 63.

In addition, Plaintiffs have also pleaded facts supporting a motive for Wells Fargo's alleged scheme. *Id.* ¶¶ 25, 51, 63. Plaintiffs note that Wells Fargo's business of servicing home mortgages generates hundreds of millions of dollars in revenues, and explain that Wells Fargo earns revenue from its mortgage servicing in three ways. *Id.* ¶¶ 8, 24. First, Wells Fargo receives a fixed fee for each loan serviced. Second, Wells Fargo earns "float" income from interest that accrues between the time when consumers make their payments and the time when the funds are forwarded to lenders, investors, taxing authorities, insurers, and other relevant parties. *Id.* Third, Wells Fargo retains all or part of its servicing fees, including late fees. *Id.* ¶ 24. Plaintiffs assert that when Wells Fargo charges for duplicative and

unnecessary property inspection fees, it creates more "float" income. *Id.* ¶ 39. In addition, they allege Wells Fargo derives additional profits from its servicing when it collects additional servicing fees, such as late fees. *Id.* ¶¶ 3, 24.

The plausibility of Plaintiffs' claims is slightly bolstered when the Court considers Plaintiffs' references to the Eastern District of Louisiana's bankruptcy proceedings in *In re Dorothy Chase Stewart,* 391 B.R. 327 (E.D.La.2008) (hereinafter "*Stewart* "). In *Stewart,* Judge Magner held that mortgage charges Wells Fargo sought to recover through bankruptcy proceedings were contrary to the terms of the mortgage. The bankruptcy court concluded that the procedure Wells Fargo employed in allocating mortgage payments led to multiple late fees for a single missed payment and was not a reasonable interpretation of the mortgage, an allegation reiterated in Plaintiffs' Complaint. *Id.* at 349–50; *see* Compl. ¶ 5. In addition, Plaintiffs note that Judge Magner concluded that Wells Fargo had a "corporate practice that fails to notify borrowers that fees, costs, or charges are being assessed against their accounts" and that Wells Fargo had exhibited a pattern of imposing "unwarranted fees and charges." *Stewart,* 391 B.R. at 342; *see* Compl. ¶ 6. Plaintiffs' references to the findings of the *Stewart* court lend a small degree of inferential support to their own claims of a systematic scheme to defraud. This is so even though the findings in *Stewart* were highly dependent on the specific facts at issue, and it is unclear to what extent the allegations of Plaintiffs' Complaint overlap with the facts in *Stewart.*[18]

In review, Plaintiffs have established that Wells Fargo had reason to know some of the fees set forth in the monthly mortgage statements were materially false. They have also shown that the manner in which the fees were communicated tended to conceal the nature of the fees, increasing the likelihood that borrowers would not challenge the bills. On this basis alone, the Court could reasonably infer that Wells Fargo recklessly disregarded the interest of the mortgage borrowers. Further, Plaintiffs have set forth facts demonstrating that Wells Fargo had both opportunity and motive to engage in the alleged fraud. Finally, Plaintiffs have produced evidence that under an analogous factual scenario, a court has had reason to conclude that Wells Fargo has a corporate practice of disregarding the interest of mortgage borrowers. When considering these additional facts, it is plausible that Wells Fargo acted with knowing intention when charging mortgagors excessive servicing fees and concealed the nature of those fees in the monthly statements. The Court concludes that when the facts are viewed in their entirety and inferences are made therefrom, a plausible pleading of a scheme to defraud, including the requisite scienter requirement, emerges. Nothing before the Court, or in its experience and common sense, suggests that it was it more probable that the alleged excessive fees were mistakes, rather than part of an intentional scheme to defraud. Accordingly, the Court concludes Plaintiffs have pleaded a plausible claim of mail fraud as a predicate act of a RICO violation, and derivatively, a plausible claim under the

---

**18.** In large part, the bankruptcy court faulted Wells Fargo for its failure to track the charges assessed against Stewart's account. *Stewart,* 391 B.R. at 343–45. It was only after an extensive review of Stewart's account that the court concluded the drive-by inspections were not reasonable in light of Stewart's regular and on-going mortgage payments, and that Wells Fargo's practice of imposing late fees was unreasonable under the terms of the mortgage contract. *Id.* at 343–45, 349–50.

1040

UCL, with sufficient particularity and plausibility to satisfy both Rule 8 and Rule 9(b).

## VI. CONCLUSION

For the reasons stated above, Wells Fargo's Motion to Dismiss and Strike Allegations, or in the alternative, Motion for a More Definite Statement, is GRANTED in part and DENIED in part. Clerk's No. 51. More specifically, Wells Fargo's Motion for a More Definite Statement is GRANTED in regard to Counts VI–VIII, but DENIED as to the remaining Counts. Wells Fargo's Motion to Dismiss is GRANTED with respect to Counts II, IV, and V, but DENIED as to all other Counts. Wells Fargo's Motion to Strike is GRANTED only as to the final sentence of paragraph four of the First Amended Complaint. In addition, Sue Ann Ross is DISMISSED as a named Plaintiff.

IT IS SO ORDERED.